UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVIS SQUARE FUNDING I, LTD.,<br>DAVIS SQUARE FUNDING II, LTD.,<br>DAVIS SQUARE FUNDING III, LTD.,<br>DAVIS SQUARE FUNDING IV, LTD.,<br>DAVIS SQUARE FUNDING V, LTD.,<br>DAVIS SQUARE FUNDING VI, LTD., and<br>WEST COAST FUNDING I, LTD.,<br><br>Plaintiffs,<br><br>-against-<br><br>AIG FINANCIAL PRODUCTS CORP.,<br><br>Defendant. | Case No.: 09-cv-2062-VM-RLE<br><br><br>ECF Case |

**MEMORANDUM OF LAW IN OPPOSITION TO
MOTION BY PLAINTIFFS AND BY NON-PARTY TCW ASSET MANAGEMENT
COMPANY UNDER FED. R. CIV. P. 26(C) AND 45(C)(3) FOR A PROTECTIVE
ORDER AND TO QUASH THE DEPOSITION SUBPOENA ISSUED BY DEFENDANT
AIG FINANCIAL PRODUCTS CORP. TO TCW ASSET MANAGEMENT COMPANY**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND ......................................................................................................................3

I.      FACTUAL BACKGROUND ............................................................................................3

      A.      Plaintiffs Are Merely Shell Companies That Act Through TCW ...........................3

      B.      To Purchase Assets, Plaintiffs Issues Multiple Classes of Notes to Investors, with the Most Senior Notes to Be Rated "AAA" ...................................4

      C.      To Hedge Their Obligations to Their Note Holders, Plaintiffs Entered Into Hedging Agreements with AIG-FP ..........................................................................4

      D.      The Swap Agreements Adopt and Track Explicitly the Rating Agencies' Criteria ..................................................................................................................5

      E.      An Unforeseen Tsunami Hits the Credit Markets...................................................7

      F.      The Credit Crisis Triggers Massive Credit Rating Downgrades; Eliminating Potential Substitute Parties.................................................................7

      G.      Plaintiffs Make No Move to Terminate the Swap Agreements Until AIG-FP Finds a Substitute Party .........................................................................................9

II.      PROCEDURAL BACKGROUND.....................................................................................9

      A.      Plaintiffs Demand Expedited Discovery Schedule .................................................9

      B.      Though Expedited Discovery Requires All Parties Utmost Good Faith; Plaintiffs Fail to Cooperate ...................................................................................10

ARGUMENT .........................................................................................................................11

I.      THE SCHEDULING ORDER DID NOT CHANGE THE SCOPE OF DISCOVERY, ONLY THE TIME FRAMES FOR PROPOUNDING AND RESPONDING ............................................................................................................12

II.      AIG-FP SUBPOENAED TCW NOT TO HARASS TCW, BUT BECAUSE TCW IS LIKELY TO HAVE RELEVANT DOCUMENTS AND TESTIMONY ...................13

      A.      TCW Is Likely to Have Discoverable Information Because Plaintiffs Are Merely Shell Companies That Act Through TCW .................................................13

B.      Discovery Requests Seeking Plaintiffs' Financial Status (Nos. 2-4) Are Directly Relevant to Plaintiffs' Asserted Priority of Payments Claim ..................14

III.      PAROL EVIDENCE IS DISCOVERABLE BECAUSE THE LANGUAGE IN THE SWAP AGREEMENTS IS AMBIGUOUS ................................................15

A.      Plaintiffs Recognize That Evidence Related to the Drafting, Negotiating, Purpose and Interpretation of the Swap Agreements (No. 1) Is Discoverable ................................................................................................15

B.      Parol Evidence Is Admissible To Evaluate Whether Contractual Language Is Ambiguous ................................................................................................16

C.      The Swap Agreements Are Facially Ambiguous ......................................17

1.      Separate Provisions in the Swap Agreements Differ as to Whether a Substitute Event Has Occurred ....................................................17

2.      Even If A Substitute Event Was Triggered, the Swap Agreements Are Ambiguous As To Whether Plaintiffs Can Terminate Without Written Consent of the Rating Agencies ...................................18

3.      The Swap Agreements Are Ambiguous As To Whether AIG-FP Has a Right to Designate Substitute Parties After the 30 Days Following a Substitute Event Trigger ..........................................19

IV.      EVEN IF THE SWAP AGREEMENTS ARE NOT AMBIGUOUS, AIG-FP'S ASSERTED DEFENSES ARE FACT INTENSIVE AND REQUIRE DEPOSITION TESTIMONY FROM TCW ................................................20

A.      AIG-FP's Asserted Defense of Temporary Commercial Impracticability Requires Subpoena Requests Nos. 1, 5, 6, 7, 8, & 9 .............................21

B.      AIG-FP's Asserted Defense of Frustration of Purpose Requires Subpoena Requests Nos. 1, 7, & 8 ..........................................................................23

C.      AIG-FP's Asserted Defense of Implied Covenant of Good Faith and Fair Dealing Requires Subpoena Request No. 9. ...........................................24

CONCLUSION ........................................................................................................25

# TABLE OF AUTHORITIES

**Page**

## Cases

Agosta v. D'Oro Foods,
  122 Misc. 2d 1091 (N.Y. Sup. Ct. 1983), *rev'd on other grounds,*
  107 A.D.2d 808, 484 N.Y.S.2d 644 (2d Dep't), *aff'd,* 65 N.Y.2d 886,
  493 N.Y.S.2d 300, 482 N.E.2d 1216 (1985)..............................................................23

Arons v. Charpentier,
  828 N.Y.S.2d 482 (2d Dep't 2007) .......................................................................23

Asphalt Intern., Inc. v. Enterprise Shipping Corp., S.A.,
  667 F.2d 261 (2d. Cir 1981)..................................................................................21

Cohen v. City of New York,
  255 F.R.D. 110 (S.D.N.Y. 2008) ..........................................................................14

Dalton v. Educational Testing Service,
  87 N.Y.2d 384 (N.Y.,1995) ..................................................................................24

Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.,
  375 F.3d 168 (2d Cir. 2004).............................................................................16, 17

Federal Ins. Co. v. Americas Ins. Co.,
  258 A.D.2d 39 (1st Dep't 1999).............................................................................18

Hoosier Energy Rural Elec. Coop,, Inc. v. John Hancock Life Ins. Co.,
  385 F. Supp. 2d 919 (S.D. Ind. 2008) ...............................................................21, 22

Metropolitan Opera Ass'n, Inc. v. Local 100, Hotel Employees and Restaurant Employees
  Intern. Union,
  212 F.R.D. 178 (S.D.N.Y. 2003) ..........................................................................12

Spano v. Kings Park Cent. School Dist.,
  2009 WL 942598 (2d Dep't 2009) .........................................................................20

World Trade Center Properties, L.L.C. v. Hartford Fire Ins. Co.,
  345 F.3d 154 (2d Cir. 2003)...............................................................................2, 16

## Statutes

Fed. R. Civ. P. 26(c) .................................................................................................1

Fed. R. Civ. P. 57......................................................................................................10

## Other Authorities

Restatement (Second) of Contracts § 261..................................................................21

Defendant AIG Financial Products Corp. ("AIG-FP") respectfully submits this memorandum of law in opposition to the Motion by Plaintiffs and by Non-Party TCW Asset Management Company Under Fed. R. Civ. P. 26(c) and 45(c)(3) for a Protective Order and to Quash the Deposition Subpoena Issued by Defendant AIG Financial Products Corp. to TCW Asset Management Company.

## PRELIMINARY STATEMENT

In this case concerning highly complex financial transactions, and faced with absolutely no threat of financial prejudice in the near future, Plaintiffs have rushed to the courthouse, demanded expedited proceedings, and are now trying to foreclose reasonable, legitimate, and necessary discovery concerning the parties' asserted claims and defenses.  It seems clear that Plaintiffs are attempting to deny AIG-FP its right to due process and a fair trial of the claims it asserts.

Though Plaintiffs attempt to malign AIG-FP with accusations of "harassing" TCW with this subpoena, Plaintiffs do not tell the Court that it is likely TCW—not the Plaintiffs—who have the documents and testimony relevant to this case.  Plaintiffs are nothing more than Cayman Islands shell companies, created solely to hold assets and distribute profits to  investors.  It is TCW, the shell companies' "Investment Advisor," that acts as Plaintiffs' agent, conducting all actions on behalf of Plaintiffs, and thus, the likely custodian of the evidence and testimony relevant to this action.  Moreover, Plaintiffs have specifically asked the Court to make a declaration regarding what payment AIG-FP should receive according to a complicated "Priority of Payment" schedule in the Swap Agreements.  This provision requires an examination of Plaintiffs' financial condition and identification of other investors and creditors who may have claims senior to AIG-FP's.  Plaintiffs' accusation that subpoenaing TCW is somehow a "harassing" "fishing expedition" is therefore highly disingenuous.

Further, while it is Plaintiffs' *position* that this case is limited solely to interpreting the terms of unambiguous contracts, that does not make it so. To the contrary, the contracts at hand are, indeed, ambiguous. What's more, the Second Circuit has specifically instructed courts to consider such extrinsic evidence as "customs, practices, usages, and terminology as generally understood in the particular trade or business' in *identifying* ambiguity within a contract." *World Trade Center Properties, L.L.C. v. Hartford Fire Ins. Co.*, 345 F.3d 154, 186 (2d Cir. 2003)(emphasis added).

Even if the contracts are not ambiguous, the most cursory review of the pleadings in this case makes clear that AIG-FP's asserted defenses are fact-specific and require the requested discovery. For example, AIG-FP asserts that performance under the contracts at issue was excused, at least temporarily, under the recognized doctrine of temporary commercial impracticability due to the financial crisis paralyzing the credit markets. Discovery is therefore required to determine the extent of the financial crisis, whether it has affected AIG-FP's ability to perform according to the terms of the contract, and whether the parties did or could have foreseen the scope of the crisis at the time of contracting.

AIG-FP also asserts that the purpose of the relevant "Substitution Event" provisions at issue here were intended to track requirements imposed by the credit agencies to ensure that Plaintiffs' most senior bonds were rated "AAA." But, AIG-FP believes—and expects that the requested discovery will confirm—that the rating agencies have since decreased the relevant requirements, which may mean that no Substitution Event has actually been triggered, and that in any event, the purpose of this provision has been frustrated since Plaintiffs' bonds no longer qualify for a AAA rating.

Finally, AIG-FP expects discovery to confirm that Plaintiffs' very purpose in bringing this lawsuit is to prevent AIG-FP from finding Substitute Parties for the swap transactions, and leverage its legal maneuvering to avoid repaying AIG-FP the $143 million loan it provided to Plaintiffs under the agreements, which would amount to a breach of the implied covenant of good faith and fair dealing.

Since the discovery requested from TCW is focused on the claims and defenses asserted in this litigation, we ask that Plaintiffs' motion to quash the subpoena be denied.

## BACKGROUND

Unless noted otherwise, the following asserted facts are based on information and belief, and subject to verification by the requested discovery.

## I.     FACTUAL BACKGROUND

### A.     Plaintiffs Are Merely Shell Companies That Act Through TCW

Each of the plaintiffs is a Cayman Islands shell company, commonly referred to as a collateralized debt obligation ("CDO").  They do not have any ongoing traditional business operations per se, but were formed specifically as limited liability investment vehicles.  With their investors' funds, Plaintiffs buy various fixed-income asset-backed securities such as residential mortgage backed securities, commercial mortgage backed securities, small business loan securities, and even other CDOs.  It is these assets that form the CDOs' collateral.

Since the CDOs are merely shell companies that hold collateral assets, the CDOs are actually run and managed by an "Investment Advisor."  It is the Investment Advisor, for example, that directs the purchase and sale of the collateral assets on behalf of Plaintiffs,[1]

---

[1]    *See e.g.* Ex. A, §§ 4.01, 4.07, 6.01 (Security Agreement for Davis Square Funding I, Ltd. ("DS I Security Agreement")).  All exhibits cited herein are attached to the Affirmation of Kevin S. Reed ("Reed Aff."), filed herewith.

disburses payments on behalf of Plaintiffs,[2] must consent to Plaintiffs' hedging and securities lending agreements,[3] and has acted on behalf of Plaintiffs in all correspondence between the parties related to the transactions at issue in this litigation.  The Investment Advisor for each plaintiff in this case is TCW Asset Management Company ("TCW"), who is also the subject of the subpoena at issue in this motion to quash (the "TCW Subpoena").[4]

> **B.     To Purchase Assets, Plaintiffs Issues Multiple Classes of Notes to Investors, with the Most Senior Notes to Be Rated "AAA"**

To purchase their collateral assets, each Plaintiff (acting through TCW) recruited investors who, in exchange for contributing capital to the CDO, received securities, such as notes and/or preferred shares, that were backed by Plaintiffs' underlying collateral.  The notes were divided into various classes of seniority, with the income generated by the collateral going to pay the most senior notes first, then the remaining funds are applied in order to the more junior notes, with the most junior notes being paid last.  This structure was designed to ensure that the most senior notes would be very safe securities and that the commercial credit rating agencies would bestow their highest credit rating ("AAA") on these most senior notes.

Having a "AAA" credit rating for Plaintiffs' most senior notes was so important to Plaintiffs that it was an express condition of the issuance of the securities in each of Plaintiffs' offering circulars (the document provided to all of Plaintiffs' prospective investors, describing such things as the securities and the kind of collateral Plaintiffs were allowed to buy with the proceeds from the sale of the securities).

> **C.     To Hedge Their Obligations to Their Note Holders, Plaintiffs Entered Into Hedging Agreements with AIG-FP**

---

[2]  *See e.g.* Ex. A § 5.01 (DS I Security Agreement).

[3]  *See e.g.* Ex. A § 8.01 (DS I Security Agreement).

[4]  Ex. B (Subpoena to TCW dated March 31, 2009).

All of the notes Plaintiffs issued to their investors were floating rate notes; meaning that the interest rate Plaintiffs were required to pay their note holders would change periodically as market interest rates changed.  To hedge against an increase in interest rates (which would require larger interest payments to their note holders), Plaintiffs entered into "swap" contracts with AIG-FP whereby AIG-FP agreed to make interest payments to Plaintiffs based on a variable interest rate, and Plaintiffs agreed to pay AIG-FP a fixed interest rate.  Plaintiffs' obligations to its note holders were thus "hedged," because as interest rates went up, and Plaintiffs owed more money to their note holders, Plaintiffs would receive larger payments from AIG-FP under the swaps.

In addition to this straight "fixed for floating" interest rate swap, AIG-FP agreed to give Plaintiffs a large upfront loan at the beginning of the transactions.  The amount loaned by AIG-FP to each plaintiff differed by transaction, but the sum total of the loans was over $143 million. To pay back the loan, Plaintiffs agreed to pay a fixed interest rate sufficiently higher than the market rate, which would result in larger fixed rate payments and pay back the loan over the life of the transactions.

While each of the plaintiffs entered into a different swap agreement with AIG-FP, they are substantially similar to one another, and will be referred to collectively as the "Swap Agreements."  It is these Swap Agreements that are at the heart of this lawsuit.

### D.     The Swap Agreements Adopt and Track Explicitly the Rating Agencies' Criteria

As part of their analysis to determine Plaintiffs' credit ratings, the rating agencies monitor Plaintiffs' hedging agreements—such as the Swap Agreements at issue in this case—and publish criteria that these swap transactions must meet.  Those criteria required, among other things, that AIG-FP (or in this case, AIG-FP's "Credit Support Provider," AIG) maintain a sufficiently high

credit rating, and that if AIG's credit rating dropped below a required threshold, AIG-FP should be replaced with another counterparty who had the requisite credit rating.

Based exclusively on consultations with the rating agencies and the agencies' requirements, and with the sole purpose of having Plaintiffs' most senior notes maintain their AAA ratings, the credit rating agencies' criteria were written into the Swap Agreements as the "Substitute Event" provisions.  As the text of the Swap Agreements make clear, the parties intended to track verbatim the rating agencies' criteria: "the Issuer may enter into or terminate Interest Rate Swap Agreements . . . in its sole discretion, subject to (x) satisfaction of the Applicable Rating Agency Condition,"[5] with "Rating Agency Condition" defined as an action which would not "result in the immediate withdrawal, reduction or other adverse action with respect to any then-current short-term or long-term rating. . . by such Rating Agency."[6]  The more recent agreements clarified this language to make it explicit that as rating agencies change their criteria, the Swap Agreements should be adjusted too:

> . . . should a Rating Agency effect an overall downward adjustment of its required ratings for hedge counterparties in collateralized debt obligation transactions, then the applicable Hedge Counterparty Ratings Requirement shall be adjusted downward accordingly. . ."[7]

At the time the parties were executing the Swap Agreements, no one contemplated that it would be difficult to find a Substitute Party for these kind of transactions.  There were so many willing and qualified potential substitute parties available at the time, that any party making a good faith effort could have effectuated a substitution within a week.  Accordingly, the parties

---

[5]   Ex. A § 8.02 (DS I Security Agreement).

[6]   Ex. A, definition of "Rating Agency Condition," (DS I Security Agreement).

[7]   Ex. C, definition of "Hedge Counterparty Ratings Requirement," (Security Agreement for Davis Square Funding V, Ltd. ("DS V Security Agreement")).

provided that in the first ten days following a downgrade in AIG's credit rating, Plaintiffs would have ten days to find a substitute party of their choice, and if they did not select one in that time frame, that AIG-FP would have an additional twenty days to select a substitute party.

### E.     An Unforeseen Tsunami Hits the Credit Markets

What the parties did not and could not contemplate at the time they negotiated the Substitute Event provisions was the unforeseen crisis that would hit the credit markets in Fall 2008.  There has been no shortage of commentary on how unprecedented and unforeseeable the "credit tsunami" was.  In a hearing before Congress on October 23, 2008, former Federal Reserve Chairman Alan Greenspan testified:

> We are in the midst of a once-in-a-century credit tsunami.  Central banks and governments are being required to take unprecedented measures. . . This crisis . . . has turned out to be much broader than anything I could have imagined. . . . Those of us who have looked to the self-interest of leading institutions to protect shareholder's equity (myself especially) are in a state of shocked disbelief.[8]

Paralleling Chairman Greenspan, Judge Richard Posner, in an article titled "Why the Economic Crisis Was Not Anticipated," wrote recently that the "financial crisis, when it finally struck the nation full-blown in September 2008, caught the government, the financial community, and the economics profession unawares."  He went on to note that "[n]o one could have calculated the probability of a financial crisis such as we are experiencing."[9]

### F.     The Credit Crisis Triggers Massive Credit Rating Downgrades; Eliminating Potential Substitute Parties

The credit tsunami caused the rating agencies to downgrade the credit ratings of scores— if not hundreds—of financial institutions, including the Plaintiffs and AIG.  With AIG's rating

---

[8]   Ex. J (testimony by Dr. Alan Greenspan before the Committee of Government Oversight and Reform, dated October 23, 2008).

[9]   Ex. D (article by Judge Richard Posner entitled, *How Did This Happen?  Why the Economic Crisis Was Not Anticipated*, dated April 17, 2009).

downgraded, AIG-FP worked to find substitute parties for the swap transactions, calling all of its contacts, and reaching out to financial institutions thought to be feasible substitute parties.  But to no avail. With so many institutions' credit ratings lowered, many once-potential substitute parties to the Swap Agreements were rendered ineligible, and the remaining qualified players were too spooked to take on any new financial commitments, especially when the counterparty to the transactions—like Plaintiffs here—were some of the very entities that were devastated by the credit crisis.  This is especially true since Plaintiffs' position in each of the swap transactions is significantly underwater by as much as $220 million.  The few players who were qualified, and at least willing to look at the transactions, rejected committing to transactions without a thorough vetting and due diligence process; one that could not be completed in the thirty days discussed in the Swap Agreements.

During this time, AIG-FP was in constant communication with Plaintiffs via TCW.  The Plaintiffs themselves never contacted AIG-FP, but it was always TCW, on TCW letterhead, that acted on behalf of Plaintiffs.  For example, it was TCW that notified AIG-FP, in a November 7, 2008 letter on TCW letterhead, that Plaintiffs could terminate the Swap Agreements,[10] it was TCW who corresponded with AIG-FP regarding the progress of AIG-FP's efforts to find substitute parties,[11] and it was TCW who discussed potential substitute parties with AIG-FP.[12]

AIG-FP believes, and expects discovery to confirm, that at the same time AIG-FP was making its good faith and concerted efforts to find a substitute party, Plaintiffs (though TCW) were honoring their contractually required good faith efforts to find substitute parties as well, but

---

[10]   Ex. E (Letter from TCW to AIG-FP, dated Nov. 7, 2009).

[11]   Ex. F (Letter from TCW to AIG-FP, dated Jan. 14, 2009).

[12]   Ex. G (Letter from TCW to AIG-FP, dated Jan. 26, 2009); Ex. H (email chain with TCW and AIG-FP, dated Feb. 20-25, 2009).

that despite these best efforts, the same unforeseen market conditions that had stymied AIG-FP's efforts, also prevented Plaintiffs/TCW from finding qualified replacement parties.

### G.     Plaintiffs Make No Move to Terminate the Swap Agreements Until AIG-FP Finds a Substitute Party

Plaintiffs contend that, because AIG's credit rating was downgraded on October 3, and that a substitute party was not found by November 3, 2008, Plaintiffs could terminate all transactions as of November 3, 2008.  But they did not terminate in November 2008.  Nor did they terminate in December, January, or February.  It was not until March 6, 2009[13]—the day after AIG-FP presented Plaintiffs with a substitute party for a large percentage of the swap transactions—that Plaintiffs brought this action for a declaratory judgment that they were entitled to terminate the swap agreements.

This timing was not coincidental.  We expect the requested discovery will show that from September or October 2008 through the present, TCW was laboring on behalf of Plaintiffs to find substitute parties for these transactions.  They were anxious to terminate the contracts so that they could enter into new swap contracts with new counterparties—contracts they hoped would no longer require Plaintiffs to repay the $143 million loan to AIG-FP.  However, due to the poor economic conditions, they were unable to find willing, qualified counterparties.  When AIG-FP secured counterparties that were willing to take over AIG-FP's position in the current Swap Agreements, only then did Plaintiffs bring suit in an attempt to stop AIG-FP's contemplated substitutions.

## II.     PROCEDURAL BACKGROUND

### A.     Plaintiffs Demand Expedited Discovery Schedule

---

[13]   Complaint, Dkt. 1.

On the same day that Plaintiffs filed suit, they filed an Order to Show Cause for an expedited hearing schedule.  Even though it was *Plaintiffs who owed AIG-FP* approximately $220 million on the transactions, Plaintiffs claimed that AIG's precarious financial condition put Plaintiffs at financial risk.  Though they had waited months before filing suit, Plaintiffs now pressed for a condensed case management scheduling order, asking for a trial within a month.[14] Judge Marrero ordered that the case be ready for trial by June 15, 2009—approximately three months after the case with filed—and entered a case management order drafted by Plaintiffs to that effect (hereinafter the "Scheduling Order").[15]

### B. Though Expedited Discovery Requires All Parties Utmost Good Faith; Plaintiffs Fail to Cooperate

The Scheduling Order does not change the scope of discovery.  Instead, consistent with Plaintiffs' demands for a quick trial, the Scheduling Order provides a dramatically truncated time line for propounding and responding to discovery requests, timelines that require the utmost good faith on behalf of all parties involved.  Unfortunately, and even though it was at Plaintiffs' insistence that the parties are facing the time constraints that we are, Plaintiffs have refused to cooperate in good faith.

Plaintiffs' counsel's actions with respect to this motion are telling.  In a perfunctory voice mail to counsel for AIG-FP, counsel for Plaintiffs stated:

> We don't think that the criteria set forth in the case management order are met because we don't think that you know that TCW has any information that is relevant or necessary to the very limited issues in the case.  I know that you have a different view about what the relevant issues are but I'm required under the rules to try

---

[14]   Order to Show Cause Why Plaintiffs' Request for Expedited Proceedings on Their Request for Declaratory Relief Should Not Be Granted Under Fed. R. Civ. P. 57, Dkt. 4 & 5.

[15]   Dkt. 11.

> to meet and confer with you before filing a motion – a discovery motion.
>
> So I am calling to ask that you withdraw the subpoena directed to TCW.  I don't expect you to agree but if you would please let me know one way or the other so that I can you know represent in our motion that we at least made an effort to resolve it.[16]

Counsel for AIG-FP responded by email, noting that "TCW is the party de facto in control of Plaintiffs and therefore likely to have information about the issues identified in our deposition notice, which we believe are proper subjects of discovery and implicated by our defenses."[17] Plaintiffs' counsel made no attempt to engage on the merits of the discovery requests, attempt to narrow the requests, or in any other way find common ground to move this case forward. Instead, Plaintiffs' counsel stated simply: "It sounds like we are at an impasse, so we will proceed with the preparation and filing of a motion on this issue."[18]

## ARGUMENT

The TCW Subpoena focuses solely on obtaining discoverable information directly related to the claims and defenses asserted in this case.  Contrary to Plaintiffs' suggestions, the Scheduling Order did not narrow the *scope* of  discoverable information, only the time frame by which the parties were required to respond.  Nor is AIG-FP harassing TCW with the subpoena. As the parties' relationship makes clear, TCW acts on behalf of Plaintiffs, and is therefore most likely to have the relevant documents and testimony.  Moreover, the central premise of Plaintiffs' motion, that the Swap Contracts are clear and unambiguous documents, does not withstand scrutiny.  But even if the agreements are unambiguous, the discovery requested is still justified based on Plaintiffs' own requested relief and AIG-FP's fact-specific defenses.

---

[16]   Reed Aff, ¶ 11.

[17]   Ex. I (email between K. Reed and M. McIntyre, dated April 9, 2009).

[18]   *Id.*

I.      **THE SCHEDULING ORDER DID NOT CHANGE THE SCOPE OF DISCOVERY, ONLY THE TIME FRAMES FOR PROPOUNDING AND RESPONDING**

Throughout Plaintiffs' motion, there is an attempt to suggest that the Scheduling Order somehow narrowed the scope of permissible discovery.  In bold italics type font Plaintiffs note, for example, that the Scheduling Order provides for depositions when "the requesting party has a good faith basis to believe the witness possesses specific *discoverable information* that is relevant and necessary to support the requesting party's claims or defenses."[19]  This is, of course, the same standard applied to discovery in general, since the Scheduling Order does not limit depositions to only "admissible" information, and parties are always required to act on good faith bases that requested information is relevant and necessary to support the claims and defenses asserted in the action.  *See Metropolitan Opera Ass'n, Inc. v. Local 100, Hotel Employees and Restaurant Employees Intern. Union*, 212 F.R.D. 178, 199 (S.D.N.Y. 2003) (noting "counsel's obligation to conduct discovery in good faith").  Indeed, Plaintiffs concede as much by noting that this provision was included to "expressly incorporate[] into the Court's Scheduling Order" the "common law prohibition against 'fishing expeditions.'"[20]

The only material change that the Scheduling Order affected was the timeframes by which the parties must exchange discovery—strict timeframes that Plaintiffs requested and that require the utmost good faith cooperation among the parties.  Regrettably, Plaintiffs have chosen not to cooperate, but instead to bring this motion which distracts and hampers the parties' ability to quickly shepherd this case to resolution on the merits.  As explained below, each of AIG-FP's

---

[19]   Pls' Brf. 2 (emphasis added).

[20]   Pls' Brf. 5.

deposition requests to TCW were made in good faith, and are directly relevant and necessary to the claims and defenses asserted in this action.

## II.   AIG-FP SUBPOENAED TCW NOT TO HARASS TCW, BUT BECAUSE TCW IS LIKELY TO HAVE RELEVANT DOCUMENTS AND TESTIMONY

In their brief, Plaintiffs have accused AIG-FP of "using the discovery process as a means to harass TCW and Plaintiffs," and that the requests in the TCW Subpoena are "designed solely for the purposes of harassment and to gather confidential (and irrelevant) information regarding Plaintiffs." These charges are highly disingenuous. AIG-FP subpoenaed TCW because Plaintiffs are merely shell companies and TCW, as their agent, is more likely to have the relevant documents and testimony. Moreover, AIG-FP has sought financial information because one of Plaintiffs' asserted claims requires it.

### A.   TCW Is Likely to Have Discoverable Information Because Plaintiffs Are Merely Shell Companies That Act Through TCW

Even though TCW is not named as a party to this action, AIG-FP believes that TCW is the entity most likely to have documents and testimony relevant to the asserted claims and defenses. The plaintiffs in this case are nothing more than Cayman Islands shell companies, and throughout AIG-FP's relationship with Plaintiffs, AIG-FP has always interacted "with" Plaintiffs through TCW. For example, it was TCW that notified AIG-FP that Plaintiffs had a right to terminate the swap transactions in November 2008,[21] it was TCW who corresponded with AIG-FP regarding the progress of AIG-FP's efforts to find substitute parties,[22] and it was TCW who discussed potential substitute parties with AIG-FP.[23]

---

[21]   Ex. E (Letter from TCW to AIG-FP, dated Nov. 7, 2008).

[22]   Ex. F (Letter from TCW to AIG-FP, dated Jan. 14, 2009).

[23]   *See e.g.* Ex. G (Letter from TCW to AIG-FP, dated Jan. 26, 2009); Ex. H (email from TCW to AIG-FP, dated Feb. 25, 2009).

Plaintiffs appear to have recognized that AIG-FP has a good faith basis for expecting TCW to have evidence relevant to the action.  In response to the Request for Production of Documents AIG-FP propounded *on Plaintiffs*, Plaintiffs responded based on the documents available to both Plaintiffs *and* TCW.  *See e.g.* Response to Request No. 6 ("Plaintiffs state that the referenced reports are generated by the Trustee and not by the Investment Advisor"); Response to Request No. 7 ("Plaintiffs state that neither Plaintiffs nor the Investment Advisor, calculate, or have documents reflecting, the current net value of Plaintiffs' assets and liabilities.").[24]

Based on this relationship, AIG-FP has a good faith basis for believing that TCW has specific discoverable information related to the claims and defenses in this case.

### B.   Discovery Requests Seeking Plaintiffs' Financial Status (Nos. 2-4) Are Directly Relevant to Plaintiffs' Asserted Priority of Payments Claim

The discovery requests related to Plaintiffs' financial condition were not designed to harass Plaintiffs or TCW, but specifically targeted at one of *Plaintiffs'* claims. *Cohen v. City of New York*, 255 F.R.D. 110, 117 (S.D.N.Y. 2008)("[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense" (internal citations omitted)). In their Complaint, Plaintiffs request a declaratory judgment that "any termination payments owed by the Plaintiffs to AIG-FP under the Agreements would constitute Defaulted Hedge Termination Payments and would be subordinated accordingly pursuant to the Waterfall Provisions."[25]  Though undefined in the Complaint, the term "Waterfall Provisions" presumably refers to the Priority of Payments provisions in the Security Agreements (incorporated by

---

[24]   Ex. K (Plaintiffs' Responses and Objections to Defendant AIG Financial Products Corp.'s First Set of Request for the Production of Documents).

[25]   Complaint, p. 9.

reference into the Swap Agreements), which details the order in which Plaintiffs' funds are distributed to their investors and creditors.

According to the Priority of Payments provisions, to determine what payments are available to each creditor, there must be a determination made as to each Plaintiff's financial assets, and the amount of cash that can be made available to make payments. Once the amount of available cash is determined, one must determine who is entitled to payments and in what order. That determination necessarily requires an identification of all the note holders, including the quantity and the class of notes that each investor owns. From there the Priority of Payments provisions discuss various liquidity ratios that must be calculated to determine which parties get priority over others, and these calculations again require detailed information describing the Plaintiffs' financial condition. It is for this reason that Plaintiffs' financial information was requested from TCW—to litigate one of the claims Plaintiffs have asserted.

**III.    PAROL EVIDENCE IS DISCOVERABLE BECAUSE THE LANGUAGE IN THE SWAP AGREEMENTS IS AMBIGUOUS**

Fundamental to Plaintiffs' objections appears to be its argument that the Swap Agreement are clear and unambiguous, and that parol evidence is therefore not discoverable. This argument is highly suspect as Plaintiffs themselves have propounded nearly identical discovery requests on AIG-FP. Moreover, the Second Circuit has explicitly directed that parol evidence should be considered in determining even *whether* contracts are ambiguous. Further, the language in the contracts themselves are ambiguous because they contain conflicting provisions, all of which means that parol evidence is not only discoverable, but admissible, and necessary to the parties' claims and defenses.

**A.    Plaintiffs Recognize That Evidence Related to the Drafting, Negotiating, Purpose and Interpretation of the Swap Agreements (No. 1) Is Discoverable**

Plaintiffs have objected to AIG-FP's first subpoena request because "extrinsic evidence regarding the negotiation and intent behind contractual provisions is inadmissible absent some ambiguity in the contract."[26]  This argument is disingenuous since Plaintiffs have made nearly identical discovery requests to AIG-FP, requesting for example "[a]ny and all documents concerning the *negotiation, purpose, implementation or interpretation* of any provisions in the Agreements concerning Substitution Events or Additional Termination Events."[27]  Assuming Plaintiffs were acting in good faith in submitting this discovery request to AIG-FP, they cannot be heard to complain now that AIG-FP's request is improper.[28]

**B.     Parol Evidence Is Admissible To Evaluate Whether Contractual Language Is Ambiguous**

"The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent."  *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004).  In determining such intent, the Second Circuit has unequivocally "instructed courts to consider the 'customs, practices, usages and terminology as generally understood in the particular trade or business' in *identifying* ambiguity within a contract." *See World Trade Center Properties, LLC v. Hartford Fire Ins. Co.*, 345 F.3d 154, 186 (2d Cir. 2003) (emphasis added).  In *Eternity Global*, for example, the district court had ruled that the term "mandatory transfer" in an ISDA credit default swap contract unambiguously precluded exchanges offered on "voluntary terms."  *See Eternity Global*, 375 F.3d at 180.  The Second Circuit reversed, however, noting that it was important to interpret "mandatory transfer"

---

[26]   Plfs' Brf. 8.

[27]   Ex. L, Request No. 2 (Plaintiffs' First Set of Document Requests to Defendant, dated March 31, 2009 (emphasis added)).

[28]   On the day this brief was due, Plaintiffs withdrew this request (Ex. N) after AIG-FP pointed out the inconsistency in their position in an April 10, 2009 meet and confer letter regarding AIG-FP's Requests for Documents to Plaintiffs and TCW (Ex. M).

in "the context of each CDS agreement and the 'customs, practices, [and] usages ... as generally understood in the credit derivatives trade," *id.*, as well as "from other indicia of the parties' intent." *Id.* at 182.

Thus, parol evidence in the form of customs, practice, and industry usage is admissible in determining *whether* there is any ambiguity in the contract.  On this basis alone, AIG-FP is entitled to subpoena documents and testimony reasonably calculated to understand how the parties and industry participants would interpret the language in the Swap Agreements.  This is particularly true here since there are provisions in the Swap Agreements that, on their face, contradict one another.

**C.      The Swap Agreements Are Facially Ambiguous**

        1.      <u>Separate Provisions in the Swap Agreements Differ as to Whether a Substitute Event Has Occurred</u>

As all participants in the interest rate swap industry know, and as the contracts themselves indicate, the Substitute Event provisions in the Swap Agreements were included solely to meet rating agencies' criteria, and intended to track such criteria literally.  All of the Substitute Event triggers in each of the Swap Agreements match identically the then-current rating agency criteria when that swap agreement was executed.  That the intent of the parties was to track literally the rating agency criteria was made explicit in the later Swap Agreements, noting specifically that "should a Rating Agency effect an overall downward adjustment of its required ratings for hedge counterparties in collateralized debt obligation transactions, then the applicable Hedge Counterparty Ratings Requirement *shall* be adjusted downward accordingly."[29]

There is no dispute that the current rating agency criteria for Substitute Event triggers have been revised downward since the Swap Agreements were executed, and that under the

---

[29]   Ex. C.

current criteria, AIG's current credit rating would no longer trigger a Substitute Event.  Thus, the

clear intent of the parties, as manifest by at least some provisions of the Swap Agreements, is

that no Substitution Event has been triggered.  Other provisions of the Swap Agreements that

have yet to be updated to reflect the current rating agency criteria, however, could be read to

indicate that a Substitute Event has occurred.  Thus, there are conflicting provisions on the face

of the Swap Agreements as to the parties' intent regarding whether a Substitute Event has been

triggered, and parol evidence must be considered to determine the parties' intent. *See Federal*

*Ins. Co. v. Americas Ins. Co.*, 258 A.D.2d 39, 43 (1st Dep't 1999)("Where, as here, there are

internal inconsistencies in a contract pointing to ambiguity, extrinsic evidence is admissible to

determine the parties' intent.")

> 2.    Even If A Substitute Event Was Triggered, the Swap Agreements Are Ambiguous As To Whether Plaintiffs Can Terminate Without Written Consent of the Rating Agencies

Plaintiffs have brought this action for a declaration that they are allowed to terminate

immediately the Swap Agreements.  In their Complaint, Plaintiffs contend that AIG-FP's failure

to find a Substitute Party within 30 days after AIG's credit rating was downgraded constituted an

"Additional Termination Event" that entitles them to terminate early the Swap Agreements.[30]

But a separate provision of the Swap Agreements provide that Plaintiffs can terminate the Swap

Agreements only upon "satisfaction of the Applicable Rating Agency Condition,"[31] which is

defined in relevant part to mean a "condition that is satisfied when Moody's and S&P . . . have

confirmed in writing to the Issuer, the Trustee and the Investment Advisor that such action will

not result in the immediate withdrawal, reduction or other adverse action with respect to any

---

[30]   Complaint ¶ 13.

[31]   Ex. A § 8.01(b) (DS I Security Agreement).

then-current short-term or long-term rating . .. of the Class A Notes or the Class B Notes."[32]  In

other words, while Plaintiff contends that certain provisions in the Swap Agreements allow them

to terminate the swaps immediately, other provisions in the Swap Agreements allow the

termination only if the rating agencies have guaranteed in writing that terminating the

agreements will not affect adversely the credit ratings on Plaintiffs' notes.

Discovery to the Issuer, the Trustee, the Investment Advisor, and the rating agencies

then, is of course relevant and necessary to this claim to determine if the rating agencies have

given the appropriate entities the requisite assurances.  Assuming they have not given such

assurance, the Swap Agreements are thus ambiguous as to whether Plaintiffs are entitled to

terminate now, and discovery should proceed regarding the parties' intent in drafting these

provisions.

  3. <u>The Swap Agreements Are Ambiguous As To Whether AIG-FP Has a
Right to Designate Substitute Parties After the 30 Days Following a
Substitute Event Trigger</u>

Plaintiffs have also asked the Court for a declaration that "AIG-FP's right to designate

substitute counterparties expired upon the occurrence of these Additional Termination Events."[33]

The question here then, is, assuming that an Additional Termination Event has occurred, and that

Plaintiffs cannot or have not terminated the contract, which party has the right to designate

Substitute Parties to the transactions?  Notably, the contracts are silent on the question of what

happens in the event that neither party is able to identify an appropriate substitute party within

the prescribed 30 day window.  Moreover, the contracts are ambiguous as to whether an

Additional Termination Event triggered by the failure of AIG-FP to assign it rights and

---

[32] Ex. A, definition of "Rating Agency Condition" (DS I Security Agreement).

[33] Complaint, p. 9.

obligations under the Swap Agreements to a substitute party with 30 days can be cured.  It is AIG-FP's position that, even assuming an Additional Termination Event has occurred, which it disputes, this "termination event" is curable.  In particular, if AIG-FP secures an appropriate Substitute Party outside the 30 day period, but before Plaintiffs exercise their purported termination rights, these termination rights are lost and the swaps continue in full force and effect.[34]  AIG-FP believes that discovery relating to the purpose and intent of the substitution provisions will confirm this interpretation, especially in light of the relevant rating agencies criteria that directs that the swap agreements should continue in place if at all possible, even following the downgrade of the swap counterparty (or credit support provider).  Plaintiffs clearly take the contrary position, given that they filed the instant action seeking to terminate the swaps the day after AIG-FP in fact secured a substitute for a large portion of the swap transactions. The contracts themselves do not resolve this issue because they are silent on the question of who may designate a substitute party outside the 30 day window, and are silent as to the consequence of any such designation on the rights of the Plaintiffs to terminate the swaps.  Therefore, parol evidence must be admitted to determine the parties' intent in relation to these provisions.  *See Spano v. Kings Park Cent. School Dist.*, 2009 WL 942598, 2 (2d Dep't 2009)("Accordingly, the CBA was ambiguous, since it was silent on the issue of whether "continuous service" included service in a temporary or substitute capacity.")

## IV.  EVEN IF THE SWAP AGREEMENTS ARE NOT AMBIGUOUS, AIG-FP'S ASSERTED DEFENSES ARE FACT INTENSIVE AND REQUIRE DEPOSITION TESTIMONY FROM TCW

---

[34]   *See* Ex. O § 6(b) (ISDA Master Agreement between Davis Square Funding I and AIG-FP, dated October 16, 2003 ("the party which is not the Affected Party ... may, by not more than 20 days notice to the other party and *provided that the relevant Termination Event is then continuing*, designate a day .. as the Early Termination Event in respect of all Affected Transactions." (emphasis added))).

AIG-FP's asserted defenses of temporary commercial impracticability, frustration of purpose, and the implied covenant of good faith and fair dealing, justify the discovery requests to TCW.[35]

### A.    AIG-FP's Asserted Defense of Temporary Commercial Impracticability Requires Subpoena Requests Nos. 1, 5, 6, 7, 8, & 9

"A basic tenet of commercial law. . .is that a party's duty to perform pursuant to a contract may be excused on the grounds of commercial impracticability." *Asphalt Intern., Inc. v. Enterprise Shipping Corp., S.A.*, 667 F.2d 261, 265 -266 (2d. Cir 1981). *See also* Restatement (Second) of Contracts § 261 ("Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.").

In *Hoosier Energy Rural Elec. Coop,, Inc. v. John Hancock Life Ins. Co.*, 385 F.Supp. 2d 919, (S.D. Ind. 2008), the court, applying New York law on the doctrine of temporary commercial impracticability, prohibited a party from terminating a swap contract after its counterparty failed to designate a substitute party within a specified time period. At issue in *Hoosier* was a credit default swap between Hoosier Energy and Ambac, that guaranteed a stream of payments from Hoosier Energy to John Hancock. The terms of the relevant contract provided that if Ambac's credit rating were to drop, Hoosier would be required to replace Ambac in the swap within 90 days. If Hoosier failed to do so, John Hancock could terminate the contract early. When the credit crisis hit, Ambac's credit rating declined, and Hoosier was unable to

---

[35]   By discussing only these affirmative defenses, AIG-FP does not waive, and hereby expressly reserves, the right to rely on other affirmative defenses at trial. AIG-FP discusses only these affirmative defenses here in the interest of brevity, and because they alone are sufficient to justify the discovery requested from TCW.

replace Ambac within the required deadline.  Hoosier filed for a temporary restraining order preventing John Hancock from terminating the contract and the court, applying New York, law granted the request.

In ruling that the Hoosier was not required to find a substitute within the prescribed timeframe, the *Hoosier* Court held that the credit crisis (the same one impacting the Swap Agreements at issue here) was unforeseeable:

> If the nature and scope of the credit crisis were more limited or a mere economic downtown, John Hancock's argument that the crisis was foreseeable or that Hoosier Energy should have protected itself better might be more persuasive.  However, the credit crisis facing the world's economies in recent months is unprecedented and was not foretold by the world's preeminent economic experts.

*Id.* at 932.  Noting that "'foreseeable' is different from 'conceivable,'" the court held that the effects of the credit crisis "were not anticipated and could not have been guarded against." *Id.*

Similarly, AIG-FP asserts here that the scope and effects of the credit crisis were unforeseeable to the parties, were not anticipated, and thus could not have been guarded against. Accordingly, many of AIG-FP's discovery requests are directly relevant to this asserted defense:

- Request No. 1 – evidence related to the drafting, negotiation, purpose, and interpretation of the Swap Agreements.  This is designed to determine whether the parties contemplated a credit crisis like the one affecting the transaction now; and whether they intended to assign the risk of such event occurring to either party

- Request No. 5 – evidence of any purported breach by AIG-FP of any obligation under the Swap Agreements.  This is designed to determine whether Plaintiffs have any information establishing that, under such circumstances, AIG-FP was still required to effect a substitution within 30 days of AIG's rating downgrade, and/or whether Plaintiffs have any evidence that Plaintiffs breached any of the contractual provisions

- Request Nos. 6 & 7 – evidence of the efforts that of any of the parties undertook to effect a substitution  This evidence is directly relevant because it shows that despite the parties best efforts, no one was able to find a substitute party within the 30 days, and thus it was not practicable to do so under the circumstances.

- Request No. 8 – ratings assigned to Plaintiffs' notes.  AIG-FP contends, and expects discovery to prove, that the rating agencies downgraded Plaintiffs' credit ratings and that this contributed to the difficulty in finding a substitute party.  AIG-FP expects discovery will show that because Plaintiffs' were in the red on these transactions by $220 million, potential substitute parties were leery of assuming the risk that Plaintiffs would honor their obligations due to Plaintiffs' credit rating downgrade.

- Request No. 9 – actions related to Plaintiffs and TCW in bringing this litigation.  Plaintiff argues that actions related to this litigation are not relevant because they occurred more than 30 days after AIG's rating downgrade.  But Plaintiffs and TCW's continued inability to find substitute parties past the 30 day threshold is even further evidence that it was impracticable to execute a substitute within 30 days of the downgrade.  Moreover, due to the timing of when Plaintiffs filed this litigation (the day after AIG-FP arranged for a substitute party for a significant portion of the swap transactions) there is reason to believe that Plaintiffs have filed this suit specifically to interfere with AIG-FP's efforts to find substitute parties for the transactions.

### B.    AIG-FP's Asserted Defense of Frustration of Purpose Requires Subpoena Requests Nos. 1, 7, & 8

Under New York law, courts excuse performance of an obligation when an unforeseen event destroys the underlying reason for performing the obligation, even though performance is still possible.  *See Agosta v. D'Oro Foods*, 122 Misc.2d 1091, 1096 (N.Y. Sup. Ct. 1983), *rev'd on other grounds,* 107 A.D.2d 808, 484 N.Y.S.2d 644 (2d Dep't), *aff'd,* 65 N.Y.2d 886, 493 N.Y.S.2d 300, 482 N.E.2d 1216 (1985); *Arons v. Charpentier*, 828 N.Y.S.2d 482, (2d Dep't 2007)(contract requiring litigants to seek expert witness fees in IDEA action was not enforceable after the Supreme Court held that prevailing parents were not authorized to recover expert fees).

AIG-FP asserts, and expects the requested discovery will confirm, that the entire purpose of the Substitute Event provisions in the Swap Agreements was to ensure that Plaintiffs senior notes retained AAA status from the credit rating agencies.  The credit rating triggers were lifted directly from the rating agencies' criteria, and the contractual provisions related to the Substitute Event provisions in the Swap Agreements expressly require that the rating agencies must certify that any material changes would not result in a credit rating decline.  Discovery will also likely

confirm that the credit ratings on Plaintiffs notes have been downgraded below AAA, and are not likely to reach AAA again any time in the foreseeable future.  With the purpose of the Substitute Event provisions (Plaintiffs' notes being rated AAA) frustrated, combined with fact that AIG's current rating is sufficient not to effect a rating downgrade for Plaintiffs' notes, AIG-FP contends that it is excused from adhering strictly to the Substitute Event provisions in the Swap Agreements.

Accordingly, the following subpoena requests are directly related to AIG-FP's asserted frustration of purpose defense:

- Request No. 1 – evidence related to the drafting, negotiation, purpose, and interpretation of the Swap Agreements.  This is designed to confirm that the purpose of the Substitute Event provisions was to ensure that Plaintiffs' most senior notes would receive a AAA rating.

- Request No. 7 – evidence of any interactions Plaintiffs and/or TCW had with the rating agencies related to the Swap Agreements.  This is designed to confirm that the purpose of the Substitute Event provisions was to ensure a AAA rating for Plaintiffs' senior debt, determine what those notes are currently rated, determine whether those notes will be rated AAA ever again, and determine whether AIG's current credit rating affects adversely Plaintiffs' credit rating.

- Request No. 8 – ratings assigned to Plaintiffs' notes.  This is designed to confirm that Plaintiffs' notes are not rated AAA.

**C.  AIG-FP's Asserted Defense of Implied Covenant of Good Faith and Fair Dealing Requires Subpoena Request No. 9.**

It is axiomatic that "[i]mplicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance." *Dalton v. Educational Testing Service*, 87 N.Y.2d 384, 389 (N.Y.,1995).  The covenant "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* (internal quotations omitted).  In the Swap Agreements, the parties bargained for essentially two purposes: (1) to "swap" interest rates payment obligations, and (2) to provide

Plaintiffs with a $143 million loan that was to be repaid to AIG-FP over the life of the transactions.

Plaintiffs' abrupt decision to file this lawsuit the day after AIG-FP provided substitute parties for a significant portion of the contracts is a clear indictment of their motives.  Discovery will likely confirm that Plaintiffs brought suit to terminate the Swap Agreements immediately— with a compressed hearing schedule that denies AIG-FP  a meaningful opportunity for discovery as required by law—in order to prevent AIG-FP from finding Substitute Parties under the Swap Agreements.  If AIG-FP finds Substitute parties that will agree to the current terms of the Swap Agreements, Plaintiffs will be required to honor the current terms, which include repaying AIG-FP its $143 million loan.  If Plaintiffs are allowed to terminate the Swap Agreements, Plaintiffs believe that they can craft new swap contracts with new counterparties and avoid repaying the $143 million loan to AIG-FP.  This would amount to a breach of the covenant of good faith and fair dealing.  Thus, in Subpoena Request No. 9, AIG-FP seeks information related to Plaintiffs and TCW's actions related to this litigation to discover if the purpose of this action is to deny AIG-FP its right to repayment of $143 million loan.  Such request then, is directly relevant to AIG-FP asserted defenses.

## CONCLUSION

Because the foregoing makes clear that each of the discovery requests contained in the TCW Subpoena is targeted at discoverable evidence directly relevant to the claims and defenses asserted in this action, Plaintiffs' motion to quash should be denied.

DATED:   New York, New York                QUINN EMANUEL URQUHART OLIVER &
           April 20, 2009                          HEDGES, LLP


By:   /s/ Kevin S. Reed
      Michael B. Carlinsky (Bar No. MC-6594)
      Kevin S. Reed (Bar No. 2639177)

51 Madison Avenue, 22nd Floor,
New York, New York  10010-1601
(212) 849-7000

*Attorneys for Defendant AIG Financial
Products Corp.*